**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Wendell Elliot RICCO, a/k/a Money**
**Mike, Defendant–Appellant.**

No. 94–5251.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 2, 1995.

Decided April 10, 1995.

**ARGUED:** Daniel Knowlton Read, Jr., Jessee & Read, P.C., Abingdon, VA, for appellant. Steven Randall Ramseyer, Asst. U.S. Atty., Abingdon, VA, for appellee. **ON BRIEF:** Charlie R. Jessee, Jessee & Read, P.C., Abingdon, VA, for appellant. Robert P. Crouch, Jr., U.S. Atty., Abingdon, VA, for appellee.

Before NIEMEYER, Circuit Judge, PHILLIPS, Senior Circuit Judge, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.

Affirmed by published opinion. Senior Judge PHILLIPS wrote the opinion, in which Judge NIEMEYER and Senior Judge Young joined.

## OPINION

PHILLIPS, Senior Circuit Judge:

Following a jury trial, Wendell Elliot Ricco was convicted of several drug trafficking offenses. Ricco now appeals, challenging various trial rulings as well as the sentencing court's determination of the amount of cocaine base attributable to him. Finding no error, we affirm.

### I.

On July 29, 1993, Wendell Elliot Ricco and seven others were named in a sealed indictment that charged them with various drug trafficking offenses.[1] Six of Ricco's coconspirators pleaded guilty, leaving him and one coconspirator to be tried by jury.

At trial, numerous witnesses testified about Ricco's involvement in drug trafficking activities. LaFonda Young, for example, testified that she purchased cocaine from Ricco on two occasions while wearing a police-monitored body wire. Two police officers corroborated Young's testimony about the controlled purchases. In addition, two vials con-

---

1. Ricco was charged with conspiracy to possess with intent to distribute cocaine and cocaine base (21 U.S.C. §§ 841(a)(1), 846), three counts of distribution of cocaine base (21 U.S.C. § 841), two counts of carrying a firearm during and in relation to drug trafficking activity (18 U.S.C. § 924(c)(1)), and possession of a firearm by a convicted felon (18 U.S.C. §§ 922(g), 924(a)).

taining the substance purchased by Young were admitted into evidence. A forensic chemist identified the substance in the vials as cocaine.

Another witness, Randy Cline, testified that Ricco made a Western Union transfer of $2,600.00 in cash while using the name "Mike Brown." Cline testified that both Ricco and the man accompanying him began pulling cash from "every pocket" in various denominations after approaching the Western Union counter. He further testified that while Ricco's associate was fishing for cash, "a small bag with a white substance of some sort landed on the counter, and very quickly the guy snatched it up and stuck it back in his pocket." J.A. 189–90.

Another witness, Trooper Anders Ashmar of the Pennsylvania State Police, testified that while on patrol on May 7, 1992, he observed a 1981 black BMW sedan swerve several times. He stopped the sedan and discovered that it was registered to Donna Jones of Bristol, Tennessee. Ashmar initially questioned only the driver, Marie Clark, who gave an address in Bristol, Virginia as her place of residence. Clark told Ashmar that she was driving her passenger, known to her only as "Mike," to New York City for an early afternoon appointment with his probation officer.

At this point, Ashmar's testimony focused on those questions asked of "Mike," whom Ashmar identified as Ricco. Without specifically stating his grounds, defense counsel objected to the admission of the testimony concerning Ashmar's conversation with Ricco. After the district court overruled the objection, Ashmar testified that his questions turned to Ricco because he appeared nervous and avoided all eye contact. According to Ashmar, Ricco explained that he was going to New York City to visit his mother and that after being told his answer was inconsistent with Clark's, also stated that he was going to New York to purchase an automobile.

At this point in the testimony, defense counsel objected to Ashmar's testimony on the ground that Ricco had not been administered his *Miranda* rights. Defense counsel requested the opportunity to voir dire Ashmar. In response, the court inquired of Ashmar whether Ricco was under arrest or free to leave during the roadside examination. Ashmar responded that Ricco was not under arrest and was free to leave at all times. The court then overruled defense counsel's objection.

Ashmar went on to testify that Ricco initially had denied having any money with him, but later admitted to having $5,000 hidden in his underwear. When asked about the source of these funds, Ricco told Ashmar that he had not been employed for five months and had not declared the $5,000 on his income tax return. At this point, Ashmar testified that he searched Ricco even though he had not obtained his consent. Ashmar found a pager clipped to Ricco's waistband along with $312, a pair of rubber gloves, and plastic bags in his pockets. In addition, Ashmar found plastic bags lining the waistband of Ricco's boxer shorts that contained $8,505.00 in cash. Ashmar also testified that he searched the vehicle after obtaining Clark and Ricco's consent. He located a bulletproof vest in the back seat.

At some point, Ricco was transported to the police station.[2] Ashmar stated that once at the station he arranged to have photographs taken of Ricco surrounded by the plastic bags filled with $8505.00 in cash. Ashmar also arranged for a trained dog to smell the currency for traces of narcotics. Over objection of defense counsel, the court admitted a photograph of Ricco with the $8505.00 into evidence as well as a separate photograph of the bundles of cash in the plastic bags. Photographs of the dog "alerting" to the currency were also admitted at trial over defense counsel's objection.

During cross examination, Ashmar testified that he had issued two citations to Clark before searching Ricco. One citation was for driving under the influence of alcohol and the other was for driving with a suspended li-

---

**2.** It is somewhat unclear from the record whether Ricco was taken to the police station before his being searched. The more plausible interpretation of Ashmar's testimony, however, is that Ricco was searched during the roadside examination.

cense. At this point in his testimony, Ashmar gave a conflicting answer as to whether Ricco was free to leave once he had been taken to the police station. He did testify, however, that Ricco was "free to go" while being photographed at the station even though the money had been confiscated.

Clark, the driver of the automobile, then testified that, in her opinion, neither she nor Ricco believed they were free to leave during the roadside examination. She testified that Ashmar had never obtained consent prior to searching Ricco's person. Clark further stated that Ashmar had not administered *Miranda* rights to anyone during the roadside examination.

The jury convicted Ricco of conspiracy to possess with intent to distribute cocaine base ("crack") in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846, possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1), carrying a firearm during and in relation to drug trafficking activity in violation of 18 U.S.C. § 924(c)(1), and two counts of distribution of cocaine base in violation of 21 U.S.C. § 841. At his sentencing hearing, the court attributed Ricco with the distribution of at least 500 grams of crack, but less than 1.5 kilograms. The court then sentenced Ricco to 420 months imprisonment.

This appeal followed.

## II.

■ Ricco first contends that the district court erred by admitting testimony that a bag containing a white powdery substance fell from the pocket of the man accompanying Ricco at the Western Union station. We disagree.

Ricco's argument is based on Fed.R.Evid. 403, which provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R.Evid. 403. A court's decision to admit evidence will not be upset by a Rule 403 challenge "except under

the most 'extraordinary' circumstances where that discretion is plainly abused." *United States v. Simpson,* 910 F.2d 154, 157 (4th Cir.1990) (citations omitted). Even though Ricco's associate was never identified, the testimony is probative of Ricco's knowledge concerning the drug activities of his associates. For this and other reasons, we do not believe that the admission of the testimony amounted to error.

## III.

■ Ricco also contends that the district court erred by admitting vials of cocaine with the accompanying lab reports into evidence because the government failed to establish a chain of custody for the vials. Reviewing for an abuse of discretion, we uphold the district court's admission of this evidence.[3]

The "chain of custody" rule is found in Fed.R.Evid. 901, which requires that the admission of an exhibit must be preceded by "evidence sufficient to support a finding that the matter in question is what its proponent claims." Detective Roberts of the Virginia Police Department testified that the envelopes submitted at trial contained the two vials that Young had purchased from Ricco. He identified the vials using his initials and the case number. Roberts testified that he personally filled out the lab request and placed the vials in the police evidence locker. Officer Pressley testified that he delivered the vials from the Bristol, Virginia police station to the lab in Roanoke, Virginia. Finally, the forensic chemist who analyzed the substances contained in the vials testified that he obtained the samples from a sealed envelope and then returned the samples to a sealed envelope upon completing his analysis.

This testimony sufficed to establish the requisite chain of custody. As we have pointed out, the " 'chain of custody' is not an iron-clad requirement, and the fact of a 'missing link' does not prevent the admission of real evidence, so long as there is sufficient proof that the evidence is what it purports to

**3.** We review the admission of the lab reports for plain error because Ricco never objected to their admission. *See* J.A. 300–02.

be and has not been altered in any material respect." *United States v. Howard–Arias,* 679 F.2d 363, 366 (4th Cir.1982). Even if the chain of custody established by the government may not have been unbroken, we find that the government satisfied its burden under Rule 901.

## IV.

■ Ricco next contends that the district court erred by admitting evidence derived from the roadside interrogation and search by Trooper Ashmar because the evidence was obtained in violation of his constitutional rights found in the Fourth and Fifth Amendments. We hold that Ricco waived the right to assert his constitutional objections by failing to file a motion to suppress the evidence before trial.

Under Fed.R.Crim.P. 12(b)(3), motions to suppress evidence must be filed prior to trial. Any failure to file a pre-trial motion to suppress constitutes waiver of the defense or objection unless the defendant can demonstrate just cause for the failure. Fed. R.Crim.P. 12(f). Ricco concedes that he did not file the requisite pre-trial motion, but argues that his objection at trial sufficed to preserve his constitutional objections. We disagree. Rule 12 specifically requires that a defendant raise his constitutional objections *before,* and not during, trial.

■ Ricco further contends that his failure is excused because "*defense counsel* did not know the evidence in question existed." Appellant's Reply Brief at 7 (emphasis added). This argument is without merit. It is undeniable that Ricco knew of the roadside incident. Because he "was personally aware of the police action which led to their acquisition of the evidence, he is responsible for informing his counsel of those facts, and a 'communications gap' in that regard will not be recognized as good cause." Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.1(a), at 193 (2d ed.1987) (citations omitted).

Like all waiver rules, this one may sometimes operate to a defendant's significant disadvantage—even provable prejudice [4]— but there are significant reasons for applying the rule with rigor. It imposes a fair and minimal burden on defendants to timely inform their counsel of obviously critical inculpatory evidence in police hands and of the circumstances of its acquisition. By this means, difficult suppression issues may be resolved before trial on fair notice to both parties. It would not do to allow the salutary purposes of the waiver rule, which is critical to pre-trial resolution of those issues, to be subverted by a defendant's simply withholding that information until trial. Accordingly, we find no error in the district court's admission of the evidence obtained in the Pennsylvania roadside encounter.

## V.

■ Ricco finally contends that the district court's attribution to him of more than 500 grams but less than 1.5 kilograms of cocaine base was clearly erroneous. We disagree.

■ Under the sentencing guidelines, a district court must make an independent resolution of the amount of drugs that can be attributed to a defendant whenever that amount is in dispute. *See* U.S.S.G. § 6A1.3(b). A preponderance of the evidence standard governs the district court's determination, *United States v. Williams,* 986 F.2d 86, 90 (4th Cir.1993) (citations omitted), which we then review for clear error, *United States v. Bynum,* 3 F.3d 769, 774 (4th Cir.1993) (citations omitted).

■ At the sentencing hearing, the government sought to prove that Ricco should be attributed with more than 1.5 kilograms of crack cocaine. In supporting its position, the government offered four exhibits of separate weights of angel food cake mix to approxi-

---

**4.** By this we do not suggest that admission of the evidence in this case was so prejudicial as to require reversal had Ricco not waived his objection. On oral argument, the government plausibly contended in response to our query, that any error in the admission of this evidence was demonstrably harmless beyond a reasonable doubt in view of the other overwhelming evidence of Ricco's guilt. We need not address that question beyond noting that prejudice sufficient to warrant reversal is by no means apparent.

mate the amount of crack cocaine that could be attributed to Ricco.[5] Special Agent Larry Hall of the Bureau of Alcohol, Tobacco, and Firearms testified that he had been advised by the Drug Enforcement Agency that angel food cake mix and cocaine have equivalent weights per volume. We do not believe that the district court's acceptance of Hall's testimony regarding the use of cake mix can be considered clear error.

Agent Hall showed Barbara Ross, a coconspirator of Ricco's, the four separate amounts of cake mix and asked her to use the exhibits in her testimony.[6] Ross stated that she had converted powder cocaine into crack cocaine for Ricco in her home on about ten to fifteen occasions. Using the exhibits of cake mix, Ross testified about the various amounts of cocaine that she had converted for Ricco. She further testified about various amounts of cocaine that she had converted for Ricco outside of her home as well as the amounts of cocaine that she had observed others convert for Ricco. According to Ross' testimony alone, the district court could have attributed Ricco with the distribution of over 500 grams of crack cocaine. The court, however, had the opportunity to consider additional evidence. Another individual who cooked cocaine powder for Ricco testified at the hearing. She corroborated Ross' testimony that Ricco travelled to New York to obtain cocaine about every two weeks. The court also was aware that 112 grams of cocaine had been found in the apartment of another woman who had cooked cocaine for Ricco.

▮ Ricco argues that even if the evidence was sufficient to connect him with the amount of cocaine powder alleged by the government, the court's estimation of the amount of cocaine base that would result from the cocaine powder constituted clear error. In *United States v. Paz*, 927 F.2d 176, 180 (4th Cir.1991), we upheld a district court's attribution that was based on a chemist's testimony that "100 grams of cocaine would yield approximately 88 grams of cocaine base." Even though no chemist testified, the district court below adopted the *Paz* conversion factor at the government's request. Ricco contends that the court's unquestioning adoption of the estimate constituted clear error because the proper conversion factor is dependent on the purity of the cocaine that is cooked. Agent Hall testified that the amount of cocaine base derived from cocaine powder is dependent on the purity of the powder. He further testified, however, that "if you had pure cocaine ... and cooked it into crack cocaine ... it's pretty much a one to one ratio as to what you could bring back." J.A. 730. It would impossible for a sentencing court to determine with any level of certainty the purity of each batch of cocaine powder that was converted and sold throughout the duration of the conspiracy. Realizing the necessarily imperfect nature of the sentencing court's determination, we conclude that the attribution made was well within the range of that which, on the evidence before the court, was possible. Accordingly, we cannot declare the finding to be clearly erroneous.

*AFFIRMED.*

---

5. When a defendant is convicted of participating in a conspiracy that had the manufacture of crack cocaine as its purpose, the district court must estimate the total amount of crack cocaine that could be processed from any pure cocaine seized. *United States v. Paz*, 927 F.2d 176, 180 (4th Cir.1991). Accordingly, the district court estimated the amount of crack cocaine that could be attributed to Ricco by looking to the .7 and .1

grams of pure cocaine involved in the two government-arranged purchases.

6. Ross earlier had pleaded guilty to conspiracy to possess with intent to distribute cocaine base in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. She stipulated to an attribution of two kilograms of cocaine base.