**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Terveus HYPPOLITE, Defendant–
Appellant.**

No. 94–5587.

United States Court of Appeals,
Fourth Circuit.

Argued May 2, 1995.

Decided Sept. 21, 1995.

**ARGUED:** Warren Gary Kohlman, Kohlman, Rochon & Roberts, Washington, DC, for appellant. Captain Benjamin Clarke Hall, Special Assistant United States Attorney, Camp Lejeune, NC, for appellee. **ON BRIEF:** Janice McKenzie Cole, United

States Attorney, Camp Lejeune, NC, for appellee.

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

Affirmed by published opinion. Judge RUSSELL wrote the majority opinion, in which Judge WIDENER concurred. Judge HALL wrote a dissenting opinion.

## OPINION

### DONALD RUSSELL, Circuit Judge:

Defendant Terveus Hyppolite appeals the denial of his motion to suppress evidence obtained during a search of his apartment He also appeals various aspects of his sentencing for drug and firearm offenses. We affirm.

### I.

After months of investigation, officers from the Jacksonville Police Department ("JPD") in North Carolina, working in conjunction with federal, state, and county law enforcement departments, suspected Steven Rodney of supplying cocaine to military personnel at Camp Lejeune, North Carolina, and to civilians. On June 1, 1993, the officers executed a search warrant at Apartment C, 132 Old Maplehurst Road ("Apartment 132–C"), in Jacksonville, Rodney's only known residence. The officers arrested Rodney and seized drugs, a gun, and drug paraphernalia during the search. The officers also noticed a pick-up truck with Florida license plates in a parking lot adjacent to the apartment building. They learned that the truck was registered to Terveus Hyppolite in Miami, Florida. Detective Steven Selogy of the JPD recognized Hyppolite's name from the investigation of a shooting in December 1992 at a mobile home registered to Rodney. Hyppolite's driver's license had been found in the mobile home.

The officers also found a local security system installer inside Apartment 132–C during the search. The installer told Commander Robert Toth of the JPD that he had given Rodney an estimate for an alarm system to be installed in an apartment at 1954 Countrywood Boulevard. The installer explained that when he had inspected the apartment for the estimate he had picked up Rodney in front of a townhouse at 1910 Countrywood Boulevard and had returned him to that location.

The officers then performed a "knock and talk" canvassing of the block around 1910 Countrywood Boulevard in an effort to find Rodney's drug-trafficking associates. Officer Timothy Malfitano of the JPD noticed Hyppolite in the front yard of 1914 Countrywood Boulevard. He also noticed a blue car with Michigan plates in front of the house. Hyppolite told the officer that he was visiting and that the owners of the residence were not home. When the officer knocked on the door, Deborah Cedeno answered and claimed that she too was visiting.

Hyppolite freely gave his name when asked by Officer Malfitano, but refused to go inside and talk. Commander Toth arrived with other officers and informed Hyppolite that he had become a target of the investigation because of his association with Rodney. Hyppolite explained that he had allowed Rodney to borrow his pick-up truck. Commander Toth then asked Hyppolite where he worked. Hyppolite responded that he invested money in stocks with his friends in Miami. Upon further questioning, he refused to disclose his sources of income and became very nervous. When Commander Toth asked him if there were controlled substances at the residence, Hyppolite asserted that he would not say anything to incriminate himself. He also declared that he did not want to speak further without a lawyer, and he refused to consent to a search of 1914 Countrywood Boulevard, which he now admitted was his residence. When Hyppolite became loud and aggressive, and began to walk away from the premises, Commander Toth "freezed" the scene by arresting Hyppolite for the misdemeanor of resisting, obstructing, and delaying a police officer. After being placed under arrest, Hyppolite yelled to Cedeno and advised her not to say anything to incriminate herself.

Meanwhile, Detective Selogy recognized the blue car and advised Commander Toth that he had seen it in front of Apartment 132–C on May 27, 1993, and that he had

followed it through Jacksonville. The occupants in the car went to pager dealers and to the house of a convicted drug dealer. Detective Selogy identified Hyppolite and Cedeno as the couple riding in the car with Rodney.[1]

Commander Toth and Detective Selogy then left to procure a search warrant while Hyppolite was detained in the yard. About two hours later, Onslow County Magistrate James Padgett issued a search warrant for 1914 Countrywood Boulevard based on Commander Toth's affidavit. During the ensuing search of Hyppolite's apartment, the officers recovered approximately 2.4 kilograms of cocaine powder, 110 grams of cocaine base, drug paraphernalia, and two guns.

On August 10, 1993, a grand jury for the Eastern District of North Carolina returned a ten-count indictment against Hyppolite and Rodney. The indictment charged Hyppolite with one count of conspiracy to possess with intent to distribute cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846; one count of possession with intent to distribute cocaine and cocaine base in violation of 21 U.S.C. § 841(a)(1); and one count of using a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c).

On December 10, 1993, United States Magistrate Judge Wallace W. Dixon conducted a hearing on Hyppolite's motion to suppress evidence obtained from the search of his apartment. On March 24, 1994, the Magistrate Judge recommended denying Hyppolite's motion because, even if the warrant lacked probable cause, the evidence should be admitted under the good faith exception to the exclusionary rule. The district court adopted the Magistrate Judge's recommendation and denied Hyppolite's motion to suppress. Hyppolite proceeded to trial, and on April 12, 1994, the jury convicted him on all three counts. During the sentencing hearing

on August 2, 1994, the district court denied Hyppolite's objections to the presentence report. The court sentenced him to life imprisonment and a concurrent forty-year term, to be followed by a five-year term for the firearm charge. The court also fined Hyppolite $300,000.

## II.

We first address Hyppolite's challenge to the district court's denial of his motion to suppress. As a preliminary matter, we find it necessary to set out the district court's precise ruling.[2] The court found that before the officers encountered Hyppolite, no probable cause existed for a search warrant because the facts, at best, supported merely a "hunch" that he was involved in Rodney's drug operation and that drugs would be found at Hyppolite's apartment. The court determined that the magistrate also considered factors such as Hyppolite's refusal to answer questions and his refusal to consent to the search, as well as the manner of his refusals. The court then noted that, although the assertion of constitutional rights usually should not support a finding of probable cause, this Court had left open the question of whether the *form* in which a suspect asserts rights can properly be considered in the context of a seizure. *See United States v. Wilson,* 953 F.2d 116, 126 (4th Cir.1991).

The district court, however, refrained from deciding whether the magistrate could properly consider the form in which Hyppolite asserted his constitutional rights. Therefore, the court, contrary to Hyppolite's belief and the government's apparent concession, never determined whether Commander Toth's affidavit established probable cause for the search warrant. Instead, the court concluded only that the evidence seized pursuant to

1. During the suppression hearing, Cedeno testified that someone other than Hyppolite was with her in the car. The government conceded that Hyppolite could not have been in the car because he had been in Miami. The district court found that Detective Selogy had believed what he had seen from objective facts and therefore that the search warrant was not tainted by the kind of deliberate falsehood or recklessness necessary for a violation of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Hyp-

polite has not appealed the court's ruling on the alleged *Franks* violation.

2. Although the Magistrate Judge submitted the recommended order adopted by the district court, we will refer to the order as the district court's to avoid confusion between the federal magistrate who conducted the suppression hearing and the county magistrate who issued the search warrant.

the warrant should be admitted under the good faith exception to the exclusionary rule. The court reasoned that:

> While it was improper to consider Hyppolite's assertion of rights, and possibly the manner in which he made these assertions, the decision as to whether such factors could be considered was essentially a legal one. In this situation, the officers sought a warrant from a neutral magistrate. The fact that the magistrate may have improperly determined which factors he could rely on in determining probable [cause] is not a matter that can be laid at the officers' feet. Nor should they be charged with the responsibility of second-guessing such legal determinations.

We now turn to the question of whether the officers satisfied the good faith requirement.

In *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the United States Supreme Court established the good faith exception to the exclusionary rule. The Supreme Court held that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 922, 104 S.Ct. at 3420. Nevertheless, the Court found that an "officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922–23, 104 S.Ct. at 3420–21 (citations and footnotes omitted). The *Leon* Court also outlined four situations in which an officer's reliance on a search warrant would not be reasonable:

(1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the truth;

(2) the magistrate wholly abandoned his detached and neutral judicial role;

(3) the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and

(4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid.

*Id.* at 923, 104 S.Ct. at 3421; *see United States v. Clutchette*, 24 F.3d 577, 581 (4th Cir.1994).

 Under *Leon*, the proper test of an officer's good faith is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n. 23, 104 S.Ct. at 3420 n. 23. This objective test requires a determination of the knowledge of a reasonable officer, not an examination of an officer's subjective motives. *Clutchette*, 24 F.3d at 582; *United States v. George*, 971 F.2d 1113, 1123 (4th Cir.1992).

 Hyppolite initially contends that the district court erroneously applied a subjective test instead of the proper objective test. To support this claim, he focuses on one sentence in the court's order: "Nor should [the police] be charged with the responsibility of second-guessing such legal determinations [by the magistrate]." When read in isolation, the court's choice of words appears to be ill-advised because an officer cannot blindly accept a magistrate's legal determination that is unreasonable. *Leon*, 468 U.S. at 922 n. 23, 104 S.Ct. at 3420 n. 23. However, we find that the sentence, when read in its proper context, indicates that the court applied an objective analysis of the officers' reliance. The court reasoned that the officers procured the warrant in good faith because the law was not clear whether some of the factors considered by the magistrate may have been impermissible. The court concluded that because the law was not clear, an officer reasonably could have relied on "such legal determinations" by the magistrate. Therefore, we find that the district court applied the proper objective test required by *Leon*.

 Hyppolite next contends that Commander Toth's affidavit was so lacking in indicia of probable cause that no officer could

have reasonably relied on the magistrate's issuance of the search warrant.[3] Because the district court found that the facts asserted in the affidavit supported merely a hunch that contraband from Rodney's drug operation would be found in Hyppolite's apartment, Hyppolite argues that no reasonable officer could have relied on the warrant. This argument misreads the court's ruling. As discussed above, the court found that the "background" facts in the affidavit—facts that occurred before the officers encountered Hyppolite—did not establish probable cause. However, the court noted, without making a probable cause determination, that the magistrate considered other factors such as Hyppolite's refusal to answer questions or to consent to a search, his request for an attorney, and his nervousness and aggressive behavior while he asserted his rights. The court further noted that the law was not clear whether a magistrate could consider these factors when making a probable cause determination. Therefore, the narrow question before this Court is whether a reasonably well trained officer would have believed that a magistrate could consider such factors.

■ We agree with the district court that a suspect's mere assertion of constitutional rights cannot constitute the *sole* basis for establishing probable cause for a search warrant. In *Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991), the *Supreme Court* stated that it has "consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." In *United States v. Wilson*, 953 F.2d 116, 126 (4th Cir.1991), we noted that the government avoided the "obvious pitfall" of offering a defendant's denial of consent to search his coat as a basis for suspicion sufficient to support a seizure at an airport.

■ We hold that an objectively reasonable officer would have applied the same principle pertaining to the reasonable suspicion requirement for seizures enunciated in *Bostick* and *Wilson* to the determination of probable cause for searches. As the Eleventh Circuit observed, "a defendant's refusal to consent to a search cannot establish probable cause to search. A contrary rule would vitiate the protections of the Fourth Amendment." *United States v. Alexander*, 835 F.2d 1406, 1409 n. 3 (11th Cir.1988); *see also United States v. Prescott*, 581 F.2d 1343, 1351 (9th Cir.1978) (stating that the "passive refusal to consent to a warrantless search is privileged conduct which cannot be considered as evidence of criminal wrongdoing"). Indeed, the Fourth Amendment would mean little if officers could manufacture probable cause by asking questions until a suspect either consents or exercises constitutional rights.

■ Although we hold that an objectively reasonable officer should have known that the mere assertion of constitutional rights cannot establish probable cause, the question of whether the *form* of the assertion of those rights could be considered as a factor is less settled. In *Wilson*, we expressed our concern that if an officer could consider the manner in which a suspect asserted his rights, a suspect could never deny consent to a search without creating reasonable suspicion for the officer to seize the suspect. *Wilson*, 953 F.2d at 126. Nonetheless, we explicitly declined "to rule that the form of a denial can *never* be included as a factor to be considered in determining whether an investigative stop was justified." *Id.*

Given our reluctance in *Wilson* to exclude consideration of the form in which a suspect asserts constitutional rights, we find that the law was not clear whether such factors should have been considered by the magis-

---

3. As we noted above, Hyppolite has abandoned his claim raised below that Commander Toth misled the magistrate with false information in his affidavit. *See supra* note 1. Hyppolite also challenges the magistrate's impartiality based upon his testimony at the suppression hearing. Hyppolite complains that the magistrate used the pronouns "we" and "us" when referring to his interaction with the police while deciding to is-

sue the warrant and that the magistrate impermissibly aided the police by considering information in the separate arrest warrant. We find that these claims lack merit. Using plural pronouns during testimony does not remotely suggest the requisite partiality to invalidate a search warrant, and the record does not indicate that the magistrate considered factors in the arrest warrant.

**1158**

trate when the officers sought the warrant to search Hyppolite's apartment. Because the law was unclear, we conclude that an objectively reasonable officer could have relied on the magistrate's determination of probable cause in this case. Commander Toth's affidavit had established a relationship between Hyppolite and Rodney. Although evidence of this relationship was insufficient to support a reasonable inference that drugs from Rodney's operation would be found at Hyppolite's apartment,[4] *see United States v. Lalor,* 996 F.2d 1578, 1582 (4th Cir.) ("In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched."), *cert. denied,* —— U.S. ——, 114 S.Ct. 485, 126 L.Ed.2d 436 (1993), the affidavit also detailed the officers' encounter with Hyppolite. Because the officers reasonably could have relied on the magistrate's determination that the manner in which Hyppolite asserted his rights could support a finding of probable cause, we affirm the district court's denial of Hyppolite's motion to suppress.

 In addition to our finding of good faith, we address the issue of whether the form in which a suspect asserts constitutional rights can establish probable cause because "the resolution of [this] particular Fourth Amendment question is necessary to guide future action by law enforcement officers and magistrates." *Leon,* 468 U.S. at 925, 104 S.Ct. at 3421. We hold that although there may be some cases where the form of a suspect's assertion of rights may support a finding of probable cause, officers and magistrates cannot rely *solely* on the form in which a suspect asserts constitutional rights to establish probable cause for a search warrant. Nor should such factors be the *prominent* factors supporting a warrant. *See Wilson,* 953 F.2d at 126 (reversing an order denying a motion to suppress evidence because of the prominence of the form of a denial as a factor

justifying an investigative stop). The Fourth Amendment generally requires more than an officer's interpretation of the reactions of an uncooperative suspect to establish probable cause.

### III.

 Hyppolite also challenges several aspects of his sentencing. Hyppolite first contends that the district court lacked sufficient evidence to convert all of the cocaine powder found in his apartment into cocaine base for the purpose of calculating his sentence. When the amount of drugs attributed to a defendant is in dispute, the district court must determine the amount of drugs based upon a preponderance of the evidence. *United States v. Ricco,* 52 F.3d 58, 62 (4th Cir.1995). We review the district court's determination of drug amounts for clear error. *Id.* When a defendant is convicted of a conspiracy involving the manufacture of cocaine base, the district court must estimate the total quantity of cocaine base that could be made from any cocaine powder seized. *Id.* at 63 n. 5 (citing *United States v. Paz,* 927 F.2d 176, 180 (4th Cir.1991)); *see also* U.S.S.G. § 2D1.1, comment. (n.12) ("Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance.").

Hyppolite was convicted for participating in a conspiracy to possess and distribute cocaine base. Police found quantities of cocaine powder and cocaine base in Hyppolite's apartment. Rodney Arnold, a government witness, testified at trial that Hyppolite and Stephen Rodney would cook the cocaine powder that they received from Haiti in order to manufacture cocaine base, which was in much greater demand. Because the district court could find Arnold's testimony credible, we conclude that the court did not commit clear error in converting all the cocaine powder found in Hyppolite's apartment into cocaine base for sentencing purposes.

4. The district court noted that the extensive suppression hearing may not have been necessary if the officers had taken a few extra minutes to write a sufficient, detailed fact statement when applying for the search warrant. The court pointed out that the affidavit did not include evidence from informants that Rodney conducted his drug operation out of more than one residence and that he dealt in large street-level quantities of drugs.

■ Hyppolite next contends that the district court erroneously imposed a $300,000 fine without making specific factual findings regarding the relevant factors listed in 18 U.S.C. § 3572(a). We require such factual findings to provide a basis for reviewing whether a district court abused its discretion in assessing a fine. *United States v. Walker,* 39 F.3d 489, 492 (4th Cir.1994). Hyppolite argues that the evidence failed to demonstrate his ability to pay such a large fine.[5] Under the guidelines, however, "The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). Therefore, the defendant bears the burden of demonstrating his present and future inability to pay. *United States v. Hairston,* 46 F.3d 361, 376 (4th Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 124, — L.Ed.2d — (1995). Hyppolite declined to complete a personal financial statement for the presentence report and did not provide any evidence at the sentencing hearing to show his inability to pay a financial sanction. *See id.* at 377 (holding that a "defendant cannot meet his burden of proof by simply frustrating the court's ability to assess his financial condition"). Because the court considered the necessary factors under 18 U.S.C. § 3572(a), and because Hyppolite did not demonstrate his inability to pay, we find that the court did not abuse its discretion in imposing a $300,000 fine.

■ Hyppolite also challenges the court's factual finding that he was an organizer or leader of a criminal activity that involved five or more participants, a finding which increased his base offense level by four levels pursuant to U.S.S.G. § 3B1.1(a). When distinguishing between the roles of participants in a criminal activity, a court should consider the following factors:

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control exercised over others.

U.S.S.G. § 3B1.1, comment. (n.4); *see United States v. Chambers,* 985 F.2d 1263, 1268 (4th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 107, 126 L.Ed.2d 73 (1993). We review the district court's factual determination of a defendant's role in an offense under the clearly erroneous standard. *See United States v. Melton,* 970 F.2d 1328, 1334 (4th Cir.1992).

Hyppolite contends that the government's evidence established only that he bought and sold drugs from the other participants, not that he exercised control over those participants. Arnold, however, testified that Rodney and Hyppolite were partners in the drug trade for about two years and that Arnold and at least seven other persons sold drugs for them. As noted earlier, Arnold also testified that Hyppolite and Rodney manufactured the cocaine base for distribution. Because the district court could find Arnold's testimony credible, we find that the court did not commit clear error in enhancing Hyppolite's sentence based on his aggravating role as an organizer or leader.

■ Finally, Hyppolite contends that the district court should have departed downward from the guidelines based on his status as a deportable alien. This Court, however, lacks jurisdiction to review a court's refusal to depart from an otherwise correctly calculated guideline range unless the record reveals that the court incorrectly concluded that it lacked the ability to depart downward. *United States v. Bayerle,* 898 F.2d 28, 30–31 (4th Cir.), *cert. denied,* 498 U.S. 819, 111 S.Ct. 65, 112 L.Ed.2d 39 (1990). In this case, the court considered the merits of departing from the guideline range. The court compared the cost to this country's taxpayers of imprisoning Hyppolite for life and the cost of deporting him. Because Hyppolite had illegally entered this country at will in the past, the court concluded that it was compelled to impose a life sentence instead of departing downward. Because the district court clearly recognized its ability to depart downward,

---

5. We note that the presentence report determined that if Hyppolite served 360 months in prison (the low end of the guidelines range) he would have the ability to pay a $19,600 fine.

we lack jurisdiction to review the court's refusal to depart downward.[6]

## IV.

For the foregoing reasons, we affirm the district court's denial of Hyppolite's motion to suppress and we affirm his sentence.

*AFFIRMED.*

K.K. HALL, Circuit Judge, dissenting:

I believe that the warrant lacked sufficient indicia of probable cause to make reliance on it objectively reasonable. Consequently, I would vacate the conviction.[1]

Hyppolite relies primarily on the third *Leon*[2] exception—the warrant affidavit is so lacking in indicia of probable cause as to render reliance on it objectively unreasonable. He cites the district court's[3] findings after a hearing on the motion to suppress that the affidavit established only "speculation" or a "hunch" that evidence would be found at 1914 Countrywood and that

> [t]he primary difficulty with this warrant then is the *undeniable* fact that Toth's belief that the premises contained contraband, *was based entirely* on Hyppolite's refusal to answer questions concerning his sources of income, his statement that he would not "incriminate himself," his request for his lawyer, and his refusal of consent to search. (emphasis added)

The district court then held that consideration of such factors is of course impermissible, discussing, among others, our opinion in *United States v. Wilson,* 953 F.2d 116 (4th Cir.1991):

> It is incongruous to suggest that when a person attempts to invoke the [4th, 5th, and 6th Amendments], ... he thereby provides police with the key to his front door. Furthermore, as in *Wilson,* courts and ju-

dicial officers should be reluctant to sanction any conduct that rests on the premise that only the guilty wish to protect their homes from police searches.

Notwithstanding these findings and holdings, the district court held that Toth and the other officers had no duty to "second-guess" the magistrate's probable cause determination. But of course they do; otherwise, *Leon* would not have any exceptions at all.

It bears reiterating that the district court found—and the government does not dispute—that Toth's belief that drugs were in the house *"was based entirely"* on the assertion of Hyppolite's constitutional rights. A reasonable officer should know that a person's refusal to surrender his rights is not evidence of wrongdoing. *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 2387–88, 115 L.Ed.2d 389 (1991) (reviewing the Court's "consistent" holdings to that effect). Toth wrote the affidavit and led the team that executed the warrant. He has the rank of Commander in the Jacksonville Police Department and heads two divisions of that department. This case is hardly the paradigm that prompted *Leon*—officers of low or middling rank, with some, though insufficient, cause to believe contraband will be discovered, relying on the wise judgment of the magistrate. Instead, this case is the paradigm of the third *Leon* exception—a high-ranking officer, with a hunch but no valid cause, seeking to exploit the remarkably inept judgment of the magistrate.

The majority pins its decision on a premise that it ultimately rejects—that Hyppolite's pugnacious manner of asserting his rights might provide probable cause. Because we did not rule out this premise for all time and all contexts in *Wilson,* the majority concludes that a reasonable officer might have thought it valid.

---

**6.** Hyppolite also contends that the term "cocaine base" as used in 21 U.S.C. § 841(b) and U.S.S.G. § 2D1.1 is unconstitutionally vague. We recently rejected this argument in *United States v. Fisher,* 58 F.3d 96 (4th Cir.1995).

**1.** The government has not alleged that denial of the motion to suppress could be harmless error; thus, I take it as conceded that the conviction must stand or fall on this issue.

**2.** *United States v. Leon,* 468 U.S. 897, 923, 104 S.Ct. 3405, 3420–21, 82 L.Ed.2d 677 (1984).

**3.** I refer to the federal magistrate as the "district court" in order to avoid confusing him with the state magistrate who issued the warrant, and because his recommendations were adopted by the district court.

All that we did in *Wilson* was decide a case or controversy, which is all we ever do, and all we are doing today. *Wilson* neither held that the suspect's manner of asserting his rights in that case provided probable cause nor suggested a hypothetical scenario in which it would. Similarly, the majority concludes here that the manner in which Hyppolite asserted his rights did not establish probable cause, but that there may be some case somewhere in which it might play a proper role.

Our reluctance to rule out the existence of an oddball case is an awfully thin ground on which to label these officers' conduct reasonable. I cannot rule out the existence of little green men watching me from a distant planet; if I arranged my affairs as if they did, would I be acting reasonably?

I am skeptical that we will ever find our oddball case. The government is the creation of the people, and the rights retained by the people may be exercised vigorously, distastefully, or contemptuously. There are no rules of etiquette. *See, e.g., Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

I have no sympathy for Hyppolite. He has been in this country illegally for years and has been in trouble with the law more or less constantly. The tattered old Fourth Amendment takes a beating when its shield is raised by such a man. But it ought not be breached.

> It is a fair summary of history to say that the safeguards of liberty have often been forged in controversies involving not very nice people. And so, while we are concerned here with a shabby defrauder, we must deal with his case in the context of what are really the great themes of the Fourth Amendment.

*United States v. Rabinowitz,* 339 U.S. 56, 69, 70 S.Ct. 430, 436, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting).

In sum, then, I think that it was objectively unreasonable for the officers to rely on the search warrant affidavit for 1914 Countrywood, because the affidavit lacked sufficient indicia of probable cause. Accordingly, I would vacate the conviction and remand with instructions to suppress the evidence.

I respectfully dissent.