# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49079

STATE OF IDAHO,

    Plaintiff-Respondent,

v.

TROY DALE GREEN,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

**Boise, November 2023 Term**

**Opinion Filed: February 8, 2024**

**Melanie Gagnepain, Clerk**

---

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Cynthia Yee-Wallace, District Judge.

The judgment of conviction is <u>affirmed</u>.

Erik R. Lehtinen, State Appellate Public Defender, Boise, for Appellant. Justin M. Curtis argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Kacey L. Jones argued.

---

BRODY, Justice.

This appeal involves an evidentiary challenge based on the Confrontation Clause in the Sixth Amendment to the United States Constitution. Troy Dale Green appeals from his judgment of conviction. At trial, a detective testified about an electronic data extraction performed on a cell phone found on the nightstand in Green's bedroom. Green objected, arguing the detective's testimony lacked foundation because the detective did not perform the extraction himself and did not have personal knowledge of the actual program used to perform the extraction. Green also argued such testimony violated the Confrontation Clause. The district court overruled the objection. We affirm the judgment of conviction.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On December 19, 2019, Boise Police Department officers executed a search warrant at

Green's trailer where he lived. Green and Sara Warner, a visitor, were present at the time. After removing Green and Warner from the trailer, officers searched the premises. In the master bedroom, officers located a cell phone on top of a nightstand. Inside the nightstand, they found a wallet with Green's name in it, a digital scale with white crystalline residue, "a decent amount of zipper style baggies and some rubber bands," and a green pipe. They also found a box of syringes in one of the drawers and mail addressed to Green.

In the bathroom, officers found numerous baggies containing a white crystalline substance next to a toilet brush jammed inside the toilet. They found additional baggies, also containing a white crystalline substance, in the toilet drain itself and in the septic tank. In the bathtub, officers found a black bag, which contained several Ziploc baggies, a blue bulbous glass pipe with burnt white residue on it, a baggie containing a white crystalline substance, and a little glass vial labeled "ephedrine." In total, officers recovered 165.24 grams of methamphetamine from the bathroom toilet and an additional 8.1 grams of methamphetamine from a separate bag found in the trailer.

In addition to the items retrieved from inside Green's trailer, officers retrieved a pistol located in a tire immediately outside Green's bedroom window. A live video feed from cameras placed on the exterior of the trailer was displayed on a television screen inside Green's bedroom at the time the officers searched the premises. Green later stated in a recorded jail phone call, "[t]hey raided [neighbor] instead of me. It gave me ten minutes, but that's all I'm gonna say." Green also admitted in a recorded jail phone call that the gun was outside the trailer and asserted, "[t]hey didn't see me do that. That was already out there. I already got that." Green has a prior felony conviction that prohibits him from possessing firearms.

At trial, Detective Rick Durbin, a forensic examiner assigned to Intermountain West Computer Forensic Lab (an FBI task force), testified about a data extraction that was performed on the cell phone found in Green's bedroom. Detective Durbin testified that he has specific training and experience in cell phone data extractions and regularly conducted them as part of his duties. He then proceeded to discuss the process of performing such data extractions and examinations. Detective Durbin explained that officers bring cell phones into the lab for examination. Once the lab has the device, forensic examiners, like himself, use forensic software to extract the data from the device: "Basically we're plugging in the device into a computer, we're using software to extract . . . the information that's on the device, and then we process the

2

information that's been extracted." If the lab is unable to extract the data, the lab sends the device to a different level in the FBI, "either electronic engineers or people with software that has greater capabilities."

Detective Durbin testified that the extraction process does not change the device's user data, or the data stored in the device's database, such as text messages. He explained that when an extraction is performed, a mathematical formula or algorithm is used to "hash," or verify, the information extracted from the device. At the start of the extraction, the extraction tool creates a hash value, which is a sequence unique to a specific digital file. The "hash value is sent along with the extraction so at any later time we can test the data to make sure that [the] hash still matches." In other words, a true copy of a data file stored on a cell phone will have exactly the same hash value as the original file. But if the data has been altered during the copying process, the altered copy would have a different hash value. Detective Durbin testified that, as part of his duties, he has access to the hash values that are stored after an extraction has been performed on a cell phone. Prior to examining the extracted data, Detective Durbin hashes any files he has received to "confirm that those [hash values] verify the ones that were created when it was extracted." After examining the extracted data, Detective Durbin once again verifies that the hash values match to confirm that the data has remained unchanged throughout each stage of the process. Detective Durbin testified that he completes this process with every cell phone extraction.

Detective Durbin further testified that after a data extraction is complete, the information "comes in a binary format, or it's just a big large file." He testified that if he is attempting to recover text messages, those text messages are inside a database; the data inside those tables must be "parsed," or "inputted out onto a different format" to become "human-readable." Detective Durbin testified that parsing data is part of his duties. After parsing the data, Detective Durbin again verifies the hash values to ensure they are the same as those created when the extraction process first began. Next, Detective Durbin places the retrieved data into a digital archive and "make[s] a report of the data that we recapped out of the extraction." This report is then turned over to a case officer or investigating officer.

Detective Durbin then testified about his involvement with the data extraction done in this case. Detective Durbin testified that he received two cell phones from Detective McCarthy (the evidence custodian technician for the search warrant executed on Green's trailer) and was

able to determine that one of the cell phones belonged to Green based on the phone's user data. He testified that an extraction was performed on Green's phone. Green objected "to basis of knowledge" and "[lack of] foundation" on Detective Durbin's testimony about whether there was an extraction, but the district court overruled that objection.

Detective Durbin continued his testimony and explained that he reviewed information from the data extraction performed on Green's phone. The State asked whether Detective Durbin compared the hash values before and after the extraction on that phone. Green objected "to [lack of] foundation" and "basis of knowledge." After a brief bench conference, the district court sustained the objection and asked the State to "lay a little bit more foundation."

Detective Durbin testified that he did not personally perform the extraction on Green's cell phone because he was unable to do so with the software available at his lab. Instead, he sent the phone to an electronic engineer with the FBI lab in Quantico, Viriginia, and the engineer sent the extracted data back to Detective Durbin "in a file format." Detective Durbin testified that he routinely reviews these files, or "the data or the notes of the extractor" as part of his duties.

Detective Durbin then testified about the process of identifying the cell phone from which the extracted data came. He testified that each cell phone is assigned a universal identifier number ("UIN") along with the originating lab's initials before the phone is sent to the FBI lab. The FBI lab adds their own initials and lab numbers such that when the phone and extracted data are returned, the UIN references both labs. In addition to the UIN, officers can also confirm the phone from which an extraction came by comparing the cell phone's unique International Mobile Equipment Identity ("IMEI") number. Detective Durbin testified that he reviewed the UIN and IMEIs to determine that the data he received back from the FBI lab was from the same phone he sent to that lab. He also testified that all hash values matched.

At that point, Green objected to the testimony on the basis of "hearsay, foundation, and confrontation" and asked to question Detective Durbin in aid of objection, which the district court permitted. During the exchange with Green's attorney, Detective Durbin testified that when he first received the cell phone from Detective McCarthy, the evidence custodian who was present during the search, Detective Durbin was able to receive data from the phone's SIM card, but was unable to perform an extraction on the phone using the software at his lab due to the phone's security system. Consequently, he sent the phone to the FBI in Quantico. An FBI electronic engineer conducted the extraction in Quantico, but Detective Durbin neither

4

participated in nor witnessed that extraction. The electronic engineer in Quantico "was able to complete a physical extraction of the device." Following this exchange, the district court overruled Green's objections.

Detective Durbin continued to testify that he knew the extracted data he received from Quantico came from the phone he identified as belonging to Green because the data he received referenced the correct UIN, including the initials from both Detective Durbin's lab and the FBI lab in Quantico, and because the phone's IMEI number was inside the extraction itself. Green again objected: "Hearsay. Foundation. Basis of Knowledge." The district court overruled the objection. Detective Durbin testified that he also compared the hash values created in Quantico at the time of the extraction to the hash values associated with the data he received, and confirmed that there were no changes. Detective Durbin testified that he reviewed the extracted data, narrowed the data down to the requested information, and provided that information to Detective Bruner through his extraction reports.

Through Detective Bruner, the State introduced extraction reports provided by Detective Durbin. The extraction reports were copies of text messages, MMS, SMS, and "Facebook-messenger-type communications." Detective Bruner testified that he reviewed the messages. Although he determined they lacked specificity and context, he detected language consistent with drug transactions. By way of example, one text message simply said, "'I have money. Can I come by?'" Detective Bruner testified that such communication is consistent with drug sales. He also testified that "there was a lot of coded verbiage or language used, that, again, based on my training and experience, was specific to drug deals, i.e., code names for controlled substances." Over Green's objection, the district court admitted several text messages into evidence containing this type of vague communication and "coded verbiage" associated with drug sales.

Ultimately, the jury found Green guilty of trafficking in methamphetamine; destruction, alteration, and/or concealment of evidence; unlawful possession of a firearm; and possession of drug paraphernalia. The jury acquitted Green of possession of a controlled substance with intent to manufacture or deliver. The district court sentenced Green to time served for the possession of drug paraphernalia offense; fifteen years with three years fixed for the trafficking offense, to run concurrently with a five-year sentence with two years fixed for the destruction, alteration, and/or concealment of evidence offense. He was also sentenced to five years with two years fixed for unlawful possession of a firearm, to run consecutively to the other sentences. Green timely

appealed.

## II.    STANDARDS OF REVIEW

"When a violation of a constitutional right is asserted, [the appellate court] will defer to the trial court's factual findings unless those findings are clearly erroneous." *State v. Stanfield*, 158 Idaho 327, 331, 347 P.3d 175, 179 (2015). "Whether admission of evidence violates a defendant's right to confront adverse witnesses under the Sixth Amendment's Confrontation Clause is a question of law over which this Court exercises free review." *Id.*

"The trial court has broad discretion in the admission and exclusion of evidence and its decision to admit evidence will be reversed only where there has been a clear abuse of that discretion." *State v. Folk*, 162 Idaho 620, 625, 402 P.3d 1073, 1078 (2017) (quoting *State v. Lopez-Orozco*, 159 Idaho 375, 377, 360 P.3d 1056, 1058 (2015)). "Whether evidence admitted by the trial court is supported by a proper foundation is reviewable under an abuse of discretion standard." *State v. Bush*, 131 Idaho 22, 34, 951 P.2d 1249, 1261 (1997) (citing *State v. Hagedorn*, 129 Idaho 155, 160, 922 P.2d 1081, 1086 (Ct. App. 1996)). In reviewing whether a trial court abused its discretion, the appellate court must conduct a four-part test to determine whether the trial court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer bounds of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *State v. Herrera*, 164 Idaho 261, 270, 429 P.3d 149, 158 (2018) (citation omitted).

## III.    ANALYSIS

Green contends the district court erred in permitting Detective Durbin to testify that the cell phone extraction performed in Quantico by the FBI lab was from Green's cell phone because Detective Durbin did not perform the cell phone extraction himself and because "there [was] no evidence he was trained on the software that was used for the extraction . . . ." Green asserts Detective Durbin's testimony (1) violated the Confrontation Clause, and (2) was insufficient to authenticate the text messages under Idaho Rule of Evidence 901(b). For the reasons explained below, we reject each argument.

### A.    Detective Durbin's testimony did not violate the Confrontation Clause.

Green contends Detective Durbin's testimony violated the Confrontation Clause because he was denied the opportunity to cross-examine the person who actually performed the cell phone data extraction. The Sixth Amendment of the United States Constitution provides criminal

defendants the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. In *Crawford v. Washington*, the United States Supreme Court held that the Confrontation Clause prohibits the admission of "testimonial" statements as evidence at trial unless the declarant is made available for cross-examination. 541 U.S. 36, 68 (2004). *Crawford* identified three non-exclusive classes of "testimonial" statements: (1) ex parte in-court testimony or its functional equivalents (including affidavits or custodial examinations); (2) extrajudicial statements contained in formalized testimonial materials (such as a notarized documents); and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id*. at 51–52 (citations omitted); *see also State v. Hooper*, 145 Idaho 139, 143, 176 P.3d 911, 915 (2007). To determine whether a statement is testimonial, a court is to apply the "primary purpose" test; a statement is testimonial when its primary purpose is to establish past events relevant to later criminal prosecution. *Davis v. Washington*, 547 U.S. 813, 822 (2006).

Green asserts that a cell phone extraction report is testimonial and implicates the Confrontation Clause because an extraction report is a conclusion generated from forensic testing for the purpose of establishing or providing some fact in a criminal proceeding. In support of this assertion, he cites to the United States Supreme Court's decisions in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313–14 (2009) (holding that certificates of analysis, which found that a substance forensically tested as cocaine, were testimonial), and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011) (holding that "surrogate testimony" regarding a forensic lab report of the defendant's blood alcohol concentration violated the Confrontation Clause because the witness did not participate in or observe the forensic testing).

This Court recently applied the standards articulated in *Melendez-Diaz* and *Bullcoming* in *State v. Stanfield*, 158 Idaho 327, 347 P.3d 175 (2015). In *Stanfield*, the defendant was charged with the death of a child, and the primary issue at trial was the cause of death. *Id*. at 330, 347 P.3d at 178. Following an autopsy, the State hired Dr. Rorke-Adams, a neuropathologist, to examine the child's brain tissue and determine his cause of death. *Id*. Dr. Rorke-Adams testified at trial that, "while she personally conducted the examination and wrote the report, she did not participate in preparing the slides that she examined[.]" *Id*. Rather, one of Dr. Rorke-Adams' technicians prepared slides of the brain tissue, and the technician did not testify at trial. *Id*. Dr. Rorke-Adams testified that she first verified the technician's work by reference to a control slide.

7

*Id.* She then "evaluated the slides and wrote a report detailing her findings and conclusions." *Id.* Stanfield objected, arguing that Dr. Rorke-Adams lacked personal knowledge of the technician's actions and Dr. Rorke Adams' testimony violated Stanfield's right to confrontation. *Id.* The district court overruled the objection. *Id.*

We affirmed the district court's decision on appeal, concluding no Confrontation Clause violation occurred. *Id.* at 340, 347 P.3d at 188. We held, "that in order for a statement—forensic or otherwise—to be deemed testimonial, it must have been made with a primary objective of creating an evidentiary record to establish or prove a fact at trial." *Id.* at 337, 347 P.3d at 185 (citations omitted). We explained, "[t]he technician did not make any conclusions or factual findings as to any issue to be decided when she labeled the slides[.]" *Id.* "Rather, the act of labeling was manifestly for a laboratory—rather than trial—purpose: to identify the samples while they awaited Dr. Rorke-Adams' examination." *Id.* We analogized the technician's actions to assertions made by people "whose name appear in a chain of custody," noting "the right to confrontation does not mandate that the prosecution call every person involved in the chain of custody." *Id.* (citing *Melendez-Diaz*, 557 U.S. at 311 n.1). Therefore, we determined "the technician's assertions were not admitted as direct proof of an element of the crime; rather, they were admitted as foundation for the introduction of the results of Dr. Rorke-Adams' testimony regarding her examination of the samples and the conclusions she drew therefrom . . . . [T]he technician in this case made no independent conclusions and the labeling did not prove any fact relevant to Stanfield's guilt or innocence." *Id.*

Importantly, we explained in *Stanfield* that the Confrontation Clause is not violated "when an expert independently evaluates objective raw data from an analyst, and exercises his or her own judgment in reaching a conclusion" because that testifying expert is not merely relaying the analyst's conclusion. *Id.* at 339, 347 P.3d at 187. In that situation, "the testifying expert's opinion is an 'original product' that can be readily 'tested through cross-examination.'" *Id.* (quoting *United States v. Summers*, 666 F.3d 192, 201–02 (4th Cir. 2011)). Thus, "the testimony of an expert witness who arrives at an independent conclusion is permissible under the Confrontation Clause even where other non-testifying analysts have provided underlying data or conducted portions of the testing." *Id.* at 338, 347 P.3d at 186. We reaffirmed this same conclusion in *State v. Hall*, 163 Idaho 744, 778, 419 P.3d 1042, 1076 (2018) (holding that the Confrontation Clause was not violated by the testimony of a witness who made independent

interpretations and conclusions from a DNA sample when someone else physically processed that raw DNA sample).

Green contends that the facts of his case are distinguishable from the facts in *Stanfield*. He argues that this case is like *Bullcoming* in that Detective Durbin was a "well-credentialled conduit" who was "just essentially relying on [the FBI lab's] work and just reviewing it." We disagree. In *Bullcoming*, the testifying analyst provided "surrogate testimony" by repeating another analyst's conclusion that Bullcoming's blood alcohol concentration "was well above the threshold for aggravated DWI[,]" a conclusion fundamental to an element of proof for the charged offense. 564 U.S. at 651, 664. Because Bullcoming did not have an opportunity to cross-examine the analyst who independently drew that conclusion, the "surrogate testimony" violated the Confrontation Clause. *Id.* at 661–62.

Here, Green's lack of opportunity to cross-examine the electronic engineer from the FBI lab in Quantico is not comparable to Bullcoming's lack of opportunity to cross-examine the certifying analyst of the forensic laboratory report regarding blood alcohol concentration. Detective Durbin did not testify to any independent conclusion drawn by the FBI electronic engineer. The FBI electronic engineer merely unlocked the door to the data and gathered it in a large file in binary format that Detective Durbin then later analyzed. Indeed, it was Detective Durbin who parsed the extracted data into a human-readable format, Detective Durbin who independently concluded the data was unchanged throughout the process, and Detective Durbin who concluded the data came from Green's cell phone.

In this case, Detective Durbin was able to draw conclusions by (1) obtaining the phone's number and unique IMEI number and assigning the lab number before sending the phone to Quantico; (2) locating the same IMEI number and lab reference numbers in the extracted data; (3) comparing the hash values created at the time of the extraction to the hash values associated with the data; (4) parsing the data himself to put the information in a human-readable format; and (5) analyzing the user data to conclude the phone belonged to Green. Detective Durbin's testimony that the data came from Green's cell phone is analogous to the testimony of Dr. Rorke-Adams in *Stanfield.* Despite not preparing the slides of brain tissue herself, Dr. Rorke-Adams was able to conclude that the brain tissue came from the deceased child and the technician applied the correct stain to the brain tissue slides because: (1) Dr. Rorke-Adams knew the brain tissue samples arrived at her lab pre-labeled; (2) the slices of brain tissue provided to

the technician had the same label; (3) that same label was also on the slides Dr. Rorke-Adams received back from the technician; and (4) the stain on the brain tissue slides matched the stain in the control slide with the same antibody Dr. Rorke-Adams requested be applied to the brain tissue. *Stanfield*, 158 Idaho at 339–40, 347 P.3d at 187–88. Therefore, just as Dr. Rorke-Adams was able to reach independent conclusions in *Stanfield* without having personally participated in preparing the brain tissue slides, Detective Durbin was also able to draw conclusions about Green's cell phone data without having personally performed the extraction. Green had an opportunity to, and in fact did, cross-examine Detective Durbin about his conclusions. Thus, we conclude that Detective Durbin's testimony was sufficient to satisfy Green's right to confrontation.

Green's citations to two recent decisions from federal district courts involving cell phone extractions do not change our analysis. We recognize that these federal decisions, while not binding on this Court, can nevertheless be persuasive authority. In *United States v. Hajbeh*, 565 F. Supp. 3d 773, 777 (E.D. Va. 2021), the U.S. District Court for the Eastern District of Virginia decided that images and videos allegedly extracted from the defendant's cell phone could not be admitted solely through the affidavits of the FBI agents who performed the extractions. Without live testimony and the defendant's ability to cross-examine a witness about the cell phone extractions, the federal court held that reliance on the affidavits for the admission of the extracted images and videos would violate the defendant's rights under the Confrontation Clause. *Id.* at 776–77. But the facts of *Hajbeh* are distinguishable from the facts in this case. Unlike the prosecution in *Hajbeh*, the State offered live testimony, through Detective Durbin, that explained the extraction process and Durbin's analysis of the extracted data, and Green was afforded an opportunity to, and did, cross-examine Detective Durbin.

Green also emphasizes that Detective Durbin did not provide testimony demonstrating any personal knowledge of the tool the FBI electronic engineer in Quantico used to perform the cell phone data extraction. Green argues Detective Durbin lacked this knowledge because he could not recall the name of the extraction tool and his lab did not have the same tool as the FBI lab in Quantico. Green cites to *United States v. Jean-Claude*, No. (S1) 18 Cr. 601 (PGG), 2022 WL 2334509 (S.D.N.Y. Jun. 27, 2022) (slip opinion), to suggest that such knowledge is required under the Confrontation Clause. However, Green understates Detective Durbin's knowledge of the extraction process and his experience reading and interpreting data extracted by the FBI lab.

10

*Jean-Claude* supports the State's position that no Confrontation Clause violation occurred here.

In *Jean-Claude*, the Government introduced excerpts from cell phone extraction reports through an investigative analyst and mobile forensics examiner who did not perform the extractions himself. *Id.* at *16. The extractions were actually performed by Croation analysts who did not testify, using a forensic software program called Cellebrite. *Id.* The defendants argued that the admission of the cell phone extractions violated their rights under the Sixth Amendment's Confrontation Clause. *Id.* at *23. However, the U.S. District Court for the Southern District of New York concluded there was no Confrontation Clause violation because (1) there was live testimony from a witness with extensive experience in the use of Cellebrite and in analyzing the extraction reports that Cellebrite creates; (2) the investigative analyst testified as to his own knowledge about extractions and made his own independent conclusions from his review of the extraction reports; and (3) the investigative analysis made independent conclusions that the evidence was derived from the defendants' cell phones and was not altered or manipulated in any way. *Id.* at *24. The federal court explained that the investigative analyst's personal knowledge and expertise with Cellebrite provided the foundation for his conclusions:

> Because of his expertise with Cellebrite, the witness recognized the extraction reports as having been generated from the Cellebrite forensic tool. Because of his knowledge of Cellebrite and the extraction reports that it generates, and his knowledge of the unique identifying numbers associated with each cell phone, Santos could testify regarding whether the cell phones at issue belonged to Defendants; whether the extraction reports were derived from these cell phones; and the likelihood as to whether the data contained on these cell phones had been altered or manipulated. In doing so, Santos did not make representations about the accuracy or quality of the forensic work performed in Croatia, or any findings made by his counterpart in Croatia.

*Id.* at *25.

The U.S. District Court's conclusions in *Jean-Claude* mirror those that we have reached here. Green makes much of the fact that in *Jean-Claude*, the investigative analyst specifically testified as to his experience with Cellebrite, whereas here, Detective Durbin did not have access to the exact same technology as the FBI lab. We do not read *Jean-Claude* as Green suggests. The investigative analyst's testimony in *Jean-Claude* was permitted because his experience performing cell phone extractions and reading extraction reports enabled him to (1) analyze the Croatian analysts' extraction reports, (2) independently conclude that the extracted data had not been manipulated, and (3) independently conclude that the data came from the defendants' cell

11

phones. *Id*.

Regardless of whether he had experience with the specific extraction tool used by Quantico, in this case, Detective Durbin testified that he had experience performing data extractions, provided detailed testimony about the extraction process, and further testified that he had experience reading, interpreting (i.e., parsing the data that the FBI's extraction tool pulled from a cell phone), and analyzing the FBI's extraction file. We conclude that such personal knowledge and experience is sufficient to support Detective Durbin's testimony and conclusions. Although Detective Durbin used the extraction file provided by the FBI lab to perform his own independent analysis of the cell phone data, each opinion Detective Durbin offered during his testimony was his own, based on his own independent analysis of the raw extraction data provided by Quantico. Therefore, we hold that Detective Durbin's testimony did not violate the Confrontation Clause.

**B.** **Detective Durbin's testimony was sufficient to authenticate the text messages under Idaho Rule of Evidence 901(b).**

Green also argues that the district court abused its discretion in admitting the text messages into evidence because Detective Durbin's testimony was insufficient to authenticate those messages under Idaho Rule of Evidence 901(b). He argues that because the district court "simply overruled" Green's foundational objection to Detective Durbin's testimony "without elaboration[,]" the district court "could not have applied the correct legal standard and its decision was not reached through an exercise of reason."

"The Idaho Rules of Evidence require 'authentication or identification as a condition precedent to admissibility,' which 'is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.' " *State v. Koch*, 157 Idaho 89, 96, 334 P.3d 280, 287 (2014) (quoting I.R.E. 901(a)). Rule 901(b) provides a non-exhaustive list of evidence that satisfies this requirement, including testimony of a witness with knowledge "that an item is what it is claimed to be" and "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." I.R.E. 901(b)(1), (4).

Green's contention that the text messages lacked authentication under Rule 901(b) is largely predicated on the same facts and arguments he made regarding the alleged Confrontation Clause violation. Green contends that Detective Durbin lacked the personal knowledge necessary

12

to testify that the text messages at issue were extracted from Green's cell phone.

We first reject Green's contention that Detective Durbin's testimony was the sole basis for authenticating the text messages. Two other detectives also provided testimony that assisted in authenticating the extracted data as from Green's cell phone. Detective Rainford testified that he found the phone on Green's nightstand and provided it to Detective McCarthy. Detective McCarthy testified that he gave the phone to Detective Durbin for extraction.

Next, Detective Durbin provided sufficient testimony to support a conclusion that the extracted data came from Green's phone. Detective Durbin examined the phone, identified its IMEI number, and assigned the phone its UIN. He then sent the phone to an FBI electronic engineer in Quantico, who extracted the data and sent it back to Detective Durbin. Detective Durbin reviewed the extraction and determined, based on the IMEIs, the UIN, and a comparison of the hash values, that the extracted data came from the same phone he sent to the FBI lab, which is the same phone provided to him by Detective McCarthy, and more, specifically, the same phone Detective Durbin had previously concluded (prior to sending the phone to the FBI lab) belonged to Green based on the user data collected from the SIM card. We therefore hold the district court did not abuse its discretion in overruling Green's foundational objection to Detective Durbin's testimony and admitting the text messages into evidence.

## IV.    CONCLUSION

For the reasons stated above, we affirm Green's judgment of conviction.

Chief Justice BEVAN, Justices MOELLER and ZAHN, and Justice Pro Tem BURDICK CONCUR.

13